FILED

2009 Aug-27  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ALABAMA FARMERS COOPERATIVE, INC., | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Civil Action No. CV-09-S-256-NE |
| HEPACO, INC., | ) ) ) | |
| Defendant. | ) ) ) ) | |

## MEMORANDUM OPINION

This action is before the court on the motion filed by defendant, HEPACO, Inc., asking the court to stay the case pursuant to 9 U.S.C. § 3, pending arbitration of the claims set forth in the complaint.[1]   HEPACO relies on an arbitration provision embedded in a "Blanket Rapid Response Services Agreement" it entered into with plaintiff, Alabama Farmers Cooperative, Inc.[2]   Plaintiff opposes the motion, arguing that the dispute that forms the basis of this action does not arise under the Rapid Response Agreement but, instead, an oral agreement between the parties.[3]

---

[1] *See* doc. no. 5 (defendant's motion to stay and to compel arbitration)

[2] *Id*., Ex. 1 ("Blanket Rapid Response Services Agreement").

[3] *See* doc. no. 6.

This court has jurisdiction over this matter because plaintiff is an Alabama agricultural cooperative located in Decatur, Alabama, while HEPACO is a North Carolina corporation, and the amount in controversy exceeds $75,000, exclusive of interest and costs.[4]  *See* 28 U.S.C. § 1332(a)(1).

## I.  BACKGROUND

HEPACO describes itself as a "provider of emergency response and remediation services," and alleges that this action arises from of its clean-up of spilled grain at the plaintiff's premises in Decatur, Alabama.[5]  One of HEPACO's project managers, Scott Browning, visited plaintiff's premises on June 20, 2008, after learning that a grain silo there was in danger of collapsing.[6]  Browning met with the vice president of plaintiff's grain division, John Gamble, and offered HEPACO's assistance in remediating a grain spill, in the event of a collapse of the silo.[7]  Mr. Gamble testified, by way of affidavit, that

> I made it clear to Mr. Browning that we did not need emergency clean up services for a non-emergency grain spill and that we would utilize our own personnel and equipment to clean the spill, but he was insistent on securing [plaintiff's] business for future emergency response and remediation services.[8]

---

[4] *See* doc. no. 1 (complaint), ¶¶ 2-4.

[5] *See* doc. no. 5, Ex. 1 (Rapid Response Agreement), at 1.

[6] *See* doc. no. 10, Ex. 1 (Affidavit of Scott Browning), ¶ 4.

[7] *See* doc. no. 7, Ex. 1 (Affidavit of John Gamble), at 2.

[8] *Id*.

Nevertheless, Mr. Gamble, as an agent of plaintiff, entered into a "Blanket Rapid Response Services Agreement" with HEPACO at four o'clock p.m. on June 20, 2008.[9]

Mr. Browning testified, by way of affidavit, that the grain silo collapsed while he was on plaintiff's premises; and that, following the collapse, he and Mr. Gamble discussed the assistance HEPACO could provide, including use of vacuum trucks to remove the spilled grain.[10]  Mr. Browning further testified that Mr. Gamble was "not sure whether [plaintiff] needed [HEPACO's] assistance . . . . At that time, however, I offered our standard Rapid Response Agreement to Mr. Gamble in the event that they needed our assistance with *the current situation or any future situation.*"[11]

The Rapid Response Agreement is an "umbrella" agreement that provides: "[plaintiff] desires to contract with [HEPACO] to provide all emergency cleanup services, remediation services, and disposal and transportation of waste and cleanup materials/debris for Client, and [HEPACO] desires to provide such service in accordance with the terms of this Agreement."[12]

---

[9] *Id.*; doc. no. 5, Ex. 1 (Rapid Response Agreement).

[10] *See* doc. no. 10, Ex. 1 (Affidavit of Scott Browning), ¶¶ 6-7.

[11] *Id.*, Ex. 1, ¶ 8 (alterations and emphasis supplied).

[12] *See* doc. no. 5, Ex. 1 (Rapid Response Agreement), at 1 (alterations supplied).

At eight o'clock a.m. the next day, June 21, 2008, Mr. Gamble telephoned Mr. Browning and requested HEPACO to provide vacuum trucks and manpower to clean-up the spilled grain.[13]   Mr. Gamble maintains that, during the telephone conversation, there was no discussion of an emergency condition or the Rapid Response Agreement.[14]   Rather, Mr. Gamble asserts that he merely "retained HEPACO on a non-emergency basis to provide the limited service of providing a vacuum truck to remove grain," and that he and Mr. Browning formed an oral agreement separate from the Rapid Response Agreement.[15]

Mr. Browning testified that Mr. Gamble never indicated that "he believed that we were forming an oral contract or any other agreement other than the signed written agreement executed the day before," and that HEPACO performed the cleanup of the spilled grain pursuant to the Rapid Response Agreement.[16]

After Mr. Browning received Mr. Gamble's telephone call on June 21, 2008, HEPACO mobilized men and vacuum trucks from Georgia and Tennessee and sent them to the plaintiff's premises.[17]   HEPACO worked at the site of the grain spill twenty-four hours a day from approximately nine o'clock a.m. on June

---

[13] *Id*, Ex. 1, ¶ 10; doc. no. 7, Ex. 1 (Affidavit of John Gamble), at 2.

[14] *See* doc. no. 7, Ex. 1 (Affidavit of John Gamble), at 2.

[15] *Id*.

[16] *See* doc. no. 10, Ex. 1 (Affidavit of Scott Browning), ¶¶ 11, 15.

[17] *Id*., ¶ 12.

21, 2008, until two o'clock p.m. on June 25, 2008.[18]   On July 16, 2008, HEPACO

mailed an invoice to plaintiff in the amount of $198,872.24 for its cleanup of the

spilled grain pursuant to the Rapid Response Agreement.[19]

Plaintiff filed a complaint in this court on February 9, 2009, seeking a

declaratory judgment that it has no obligation to HEPACO under the Rapid

Response Agreement, and that its liability shall only be for reasonable and

necessary services it authorized.[20]   Plaintiff also seeks a declaration as to the

amount owed for HEPACO's services.[21]

HEPACO subsequently moved this court to stay the action and compel

arbitration of the claims set forth in plaintiff's complaint pursuant to the

arbitration provision embedded in the Rapid Response Agreement.[22]   The

arbitration provision reads as follows:

> All claims, disputes, and other matters or questions arising out
> of or relating to this Agreement shall be decided by arbitration in
> accordance with the Construction Industry Arbitration Rules of the
> American Arbitration Association unless the parties mutually agree

---

[18] *Id.*, ¶¶ 13-14; doc. no. 7, Ex. 2 at 3.

[19] *See* doc. no. 1 (complaint), ¶ 20.

[20] *See* doc. no. 1 (complaint) at 4, ¶¶ d-e.

[21] *Id*, ¶ f.

[22] *See* doc. no. 5.

otherwise.   Judgement upon the award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof.[23]

## II.  DISCUSSION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, establishes a national policy favoring arbitration and a body of substantive law governing the subject.  *See*, *e.g.*, *Shearson / American Express*, *Inc. v. McMahon*, 482 U.S. 220, 226 (1987).  The Supreme Court has clearly stated that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983).  "[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."  *Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626 (1985). The policy fostered by the FAA, however, "does not require parties to arbitrate when they have not agreed to do so."  *Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 478 (1989).

---

[23] *Id.*, Ex. 1 (Rapid Response Agreement), ¶ 8.  There is no dispute in this case that the Rapid Response Agreement is in writing; further, the FAA's broad interstate commerce requirement is satisfied in this case because HEPACO is North Carolina corporation, and vacuum trucks and men used in the cleanup traveled from Georgia and Tennessee to plaintiff's premises in Alabama. Further, the Supreme Court directed district courts to accord an expansive construction to the FAA's phrase "involving commerce."  *See Allied-Bruce Terminix Cos., Inc. v. Dobson,* 513 U.S. 265, 268 (1995).

To effectuate the federal policy favoring arbitration, the FAA provides a procedure for compelling enforcement of arbitration agreements in cases where one party refuses to comply.  That is, the proponent of arbitration may petition any district court having jurisdiction of the controversy to order compliance, in which case the court must order arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue."  9 U.S.C. § 4.

When addressing a motion to compel arbitration pursuant to 9 U.S.C. § 4, the court must first determine whether there is a binding agreement to arbitrate. *See Mitsubishi Motors Corp.*, 473 U.S. at 626 (observing that "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute"); *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960) ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

Here, plaintiff argues that a binding agreement to arbitrate does not exist between the parties because the clean-up of plaintiff's grain spill was a "non-emergency service" provided pursuant to an oral agreement, and not the written Rapid Response Agreement.  Stated another way, plaintiff contests whether HEPACO's clean-up of the spilled grain fell within the scope of the Rapid

Response Agreement.  Significantly, plaintiff does not contest the validity of the

Rapid Response Agreement, or the arbitration provision embedded it.[24]

The question of whether "a party has agreed to arbitrate an issue is a matter

of contract interpretation."  *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248

F.3d 1109, 1114 (11th Cir. 2001).  When construing the terms of the agreement,

"any doubts concerning the scope of arbitrable issues should be resolved in favor

of arbitration, [regardless of] whether the problem at hand is the construction of

the contract language itself or an allegation of waiver, delay, or a like defense to

arbitrability."  *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25; *see also*

*International Underwriters AG v. Triple I: International Investments, Inc.*, 533

F.3d 1342, 1344-45 (11th Cir. 2008) ("The canons of construction run in favor of

arbitration.").

Here, this court finds that HEPACO's clean-up of the spilled grain clearly

was covered by the Rapid Response Agreement.  First, the "Background" section

of the agreement indicates that cleanup of a "spill," grain or otherwise, was a

service contemplated by the parties under the agreement.  The agreement states:

"As part of [plaintiff's] operations, there is a potential for property belonging to . .

---

[24] Only if the *agreement to arbitrate* is "'in issue,' the Federal Arbitration Act (FAA) requires the district court to 'proceed summarily to the trial thereof' and if the objecting party has not requested a jury trial, 'the court shall hear and determine such issue.'" *Magnolia Capital Advisors Inc., v. Bear Stearns & Co.*, 272 Fed. Appx. 782, 785 (11th Cir. 2008) (quoting 9 U.S.C. § 4).

. [plaintiff] to spill, be released or otherwise create an emergency condition(s) ('Emergency Condition(s)') that requires environmental emergency response, cleanup and remediation services."[25]  The agreement further states that "[plaintiff] desires to contract with [HEPACO] to provide all emergency cleanup services, remediation services, and disposal and transportation of waste and cleanup materials/debris," and that plaintiff, in order to "eliminate or contain Emergency Condition(s), as presently exist *or may exist in the future*, desires to engage [HEPACO] to provide all environmental emergency response, cleanup and remediation services arising out of [plaintiff's] operations . . . ."[26]  Additionally, the Rapid Response Agreement includes a merger clause stating that it is the only agreement between the parties *and that the agreement may only be modified through a separate written agreement*.  The merger clause provides that:

> This agreement . . . represents the entire understanding and agreement between the parties hereto relating to the Emergency Cleanup Work and follow-up Remediation Work, and supersedes any and all prior agreements, whether written or oral, that may exist between the parties regarding the same.  *No amendment or modification to this Agreement or any waiver of any provision hereof shall be effective unless in writing signed by the party so to be bound thereby.*[27]

---

[25] Doc. no. 5, Ex. 1, ¶ 1.

[26] *Id.* (emphasis supplied).

[27] *Id.*

In sum, it is undisputed that the Rapid Response Agreement was executed contemporaneously with the grain spill at plaintiff's premises, and this court finds that, when construing all doubts in favor of arbitration, the agreement encompasses HEPACO's clean-up of the grain. *See Moses H. Cone Memorial Hosp.*, 460 U.S. at 24-25. Therefore, the arbitration provision in the Rapid Response Agreement encompasses the claims set forth in plaintiff's complaint.

## III.  CONCLUSION

In accordance with the foregoing, HEPACO's motion to stay the action and compel arbitration will be GRANTED. An appropriate order consistent with this memorandum will be entered contemporaneously herewith.

DONE and ORDERED this 27th day of August, 2009.

_____
United States District Judge